Durham District Court
No. 99-586

THE STATE OF NEW HAMPSHIRE

v.

STEVEN DIAMOND

August 10, 2001

*Philip T. McLaughlin*, attorney general (*Ann M. Rice*, senior assistant attorney general, on the brief and orally), for the State.

*Law Office of Joshua L. Gordon*, of Concord and *Law Office of Barbara A. Bradshaw*, of Durham (*Joshua L. Gordon* and *Barbara A. Bradshaw* on the brief, and *Mr. Gordon* orally), on behalf of the New Hampshire Civil Liberties Union, for the defendant.

NADEAU, J. The defendant, Steven Diamond, challenges his conviction in the Durham District Court (*Taube*, J.) of obstructing government administration, *see* RSA 642:1 (1996). We affirm.

The following facts are supported by the record. The Town of Durham (town) and the University of New Hampshire (UNH) have signed a document entitled "Policy on Town of Durham — University of New Hampshire Law Enforcement Procedures & Relationships" (policy). That document provides in part:

> The Town of Durham shall, upon request of the University of New Hampshire Director of Public Safety, or in his/her absence, his/her designee, deputize those qualified members of the University of New Hampshire Public Safety Division as police officers and shall have the right to suspend their police powers immediately for cause, and to revoke their police powers for cause. Final revocation of their police powers shall only be made after presentation of reasons to the Joint Town-University of New Hampshire Advisory Committee within a reasonable length of time.

Nowhere in the document is the University department referred to as a police department; rather, it is referred to as the "University of New Hampshire Public Safety Division." It is established, however, that the Public Safety Division is from time to time referred to as the University police department.

On March 25, 1999, Sergeant Clancy J. McMahon of the UNH Public Safety Division responded to a possible disturbance taking place in the Memorial Union Building during an intern-recruiting presentation by the Disney Corporation. Upon arriving at the presentation, Sergeant McMahon observed nine protesters standing in the front of the room wearing masks and holding signs. When one of the protesters became disruptive, Sergeant McMahon arrested

him for disorderly conduct and began to escort him out of the room. People on both sides of Sergeant McMahon stepped aside as he escorted the subject through the "shoulder to shoulder" crowd until he reached the defendant, who stepped out in front of him. Sergeant McMahon told the defendant, who was wearing a mask and holding a sign, that he needed to move out of his way. Sergeant McMahon spoke loudly and made eye contact with the defendant. The defendant did not move. Sergeant McMahon again told the defendant, in a loud, stern voice, that he had to move out of the way or he would be arrested. When the defendant failed to get out of the way, Sergeant McMahon directed another UNH public safety officer standing nearby to arrest him. The defendant was charged with, and convicted of, obstructing government administration.

The defendant seeks reversal of his conviction, arguing that the arresting officer lacked the authority to arrest in the name of the State because the so-called UNH police department is not a validly constituted police department. Citing RSA 105:1 (1990), RSA 105:3 (1990) and RSA 105:4 (1990), which authorize the selectmen of a town to appoint, pay and employ police officers, the defendant argues that UNH, which is not a town, cannot appoint and employ its own police officers.

The defendant also argues that to the extent the town has purported to delegate its statutory arrest authority to the UNH "police department," such delegation is ultra vires and void. The defendant contends that the town attempted to contractually delegate its police powers to UNH in the policy document. The defendant's arguments are misplaced. The narrow issue before us is not whether the UNH Public Safety Division as a whole is a legally constituted police department, but whether the arresting officers in this case had the power to arrest the defendant.

RSA 594:10 (Supp. 2000) sets forth the circumstances under which a "peace officer" may lawfully make a warrantless arrest. RSA 594:1, III (1986), in turn, defines a peace officer as "any sheriff or deputy sheriff, mayor or city marshal, constable, police officer or watchman, member of the national guard acting under orders while in active state service ordered by the governor under RSA 110-B:6, or other person authorized to make arrests in a criminal case." We noted in *State v. Swan*, 116 N.H. 132, 133 (1976), that the "extensive list of persons" granted arrest authority under RSA 594:1 and RSA 594:10 "indicat[ed] a legislative intent to provide maximum protection to the community." We therefore interpreted those statutes expansively to include all police officers whether regular, special or auxiliary. *See id.*

■ The trial court found that the arresting officers had been appointed "as police officers *for the town of Durham*, with general police powers, including the power of arrest. They were then duly sworn to their duties by the town clerk. In exercising these powers, they are ultimately accountable to and under the control of the Durham police chief." (Emphasis added.) In light of this finding, the defendant's contention that "the position itself of 'UNH police officer' does not [legally] exist" is irrelevant. The defendant does not dispute that the position of "Durham police officer" exists or that a Durham police officer has the authority to arrest under RSA 594:10.

The only challenge the defendant makes to the trial court's factual findings relating to the officers' appointments as Durham police officers is whether the Durham police chief has control over the UNH officers. The defendant argues that although Durham Police Chief David Kurz has "theoretical control" over UNH "police officers," he does not have "practical day-to-day" control over them. The defendant argues, for instance, that Chief Kurz does not engage in day-to-day supervision of UNH "police officers," he exercises no control over the terms and conditions of their employment, and he does not routinely review UNH records relating to officers.

■ The defendant also contends that Chief Kurz does not set policy for the UNH "police department" and that "[e]ach department is responsible for its own discipline and oversight." The defendant argues that this relationship between the Durham police chief and the UNH "police department" violates the supervision and superintendence provisions of RSA 105:1.

RSA 105:1 provides, in part:

> The selectmen of a town, when they deem it necessary, may appoint special police officers who shall continue in office during the pleasure of the selectmen, or until their successors are chosen or appointed. The selectmen may designate one of the police officers as chief of police or superintendent and as such officer the chief of police or superintendent shall exercise authority over and supervise or superintend other police officers, police matrons, watchmen or constables appointed under the provisions of this chapter, and said police officers, police matrons, watchmen or constables shall be accountable and responsible to said chief of police or superintendent.

The statute's plain language does not require that the chief of police exercise actual day-to-day supervision of all officers under his or her

command. Indeed, it is difficult to imagine how such control could be carried out given that most police departments, including the Durham police department, operate twenty-four hours a day, seven days a week, three hundred sixty-five days a year, and that police departments in large cities employ even more officers. We conclude that the statute permits a chief of police to delegate day-to-day supervisory authority to others so long as the chief retains ultimate authority over the department.

■ Chief Kurz's testimony confirmed that day-to-day supervision over Durham police officers is exercised by the sergeants and captains under him in the department, although he "as chief could step in at any time." He further testified that in supervising UNH officers, the UNH "police chief" served a function similar to the Durham sergeants and captains. Moreover, he affirmed that, as with the officers under his own sergeants and captains, he could "step in as chief of police at any time" with respect to the officers under the UNH "police chief's" command. We conclude that the trial court did not err in finding that the arresting officers in this case "are ultimately accountable to and under the control of the Durham police chief," and we do not read RSA 105:1 to require anything more than ultimate control.

The defendant next challenges the applicability of the obstructing government administration statute to the conduct for which he was charged and convicted. The statute provides, in part: "A person is guilty of a misdemeanor if he uses force, violence, intimidation or engages in any other unlawful act with a purpose to interfere with a public servant, as defined in RSA 640:2, II, performing or purporting to perform an official function . . . ." RSA 642:1. The defendant was charged with violating this statute by means of an "unlawful act."

The defendant argues that according to the commentary to the Model Penal Code provision corresponding to RSA 642:1, the unlawful act engaged in must be made unlawful for some reason other than the actor's intent to obstruct a governmental function. He contends that standing in front of an officer and refusing to move when directed is not otherwise unlawful under any criminal law, tort law, or administrative regulation.

The State argues that the defendant engaged in the separate unlawful act of disorderly conduct. RSA 644:2, II(e) (1996) provides that the offense of disorderly conduct is committed when a person "[k]nowingly refuses to comply with a lawful order of a peace officer

to move from any public place." RSA 644:2, IV(a) (1996) defines a lawful order to include:

(1) A command issued to any person for the purpose of preventing said person from committing any offense set forth in this section, or in any section of Title LXII or Title XXI, when the officer has reasonable grounds to believe that said person is about to commit any such offense, or when said person is engaged in a course of conduct which makes his commission of such an offense imminent . . . .

The defendant argues, however, that the State's reasoning is fatally circular because: (1) in order to have committed the offense of obstructing government administration, the defendant must have been committing the unlawful act of disorderly conduct; (2) in order to have been engaged in disorderly conduct, the defendant must have refused to comply with a lawful order; (3) a lawful order is a command issued to a person to prevent him from committing an offense; and (4) the offense the defendant was allegedly committing was obstructing government administration.

■ The State responds by arguing that at step four of the defendant's analysis, the offense the defendant was about to commit was resisting arrest, not disorderly conduct. *See* RSA 642:2 (1996) (offense of resisting arrest is committed when a person purposely or knowingly physically interferes with the arrest of himself or another). We agree and conclude that the State charged the defendant with acts constituting a violation of RSA 642:1.

The defendant next contends that RSA 642:1 was not intended to criminalize political action. He argues that the legislature omitted from RSA 642:1 language in the Model Penal Code that would have made criminal the impairment of government administration by "physical interference or obstacle." He also contends that the commentary to the analogous Model Penal Code provision cautions against drafting the provision so broadly that it might apply to political protest over government policy or the exercise of other civil liberties.

■ The defendant does not, however, argue that RSA 642:1 is ambiguous. Thus, while he invokes legislative history, he offers no justification for looking beyond the plain language of the statute, which contains no express exception for political protest. *See Appeal of Cote*, 144 N.H. 126, 129 (1999).

■ The State also argues that the defendant's conduct was not passive political protest, as the defendant did not just refuse to

move, but actually stepped in front of Sergeant McMahon. The record supports the State's contention. We conclude that the defendant's conduct, notwithstanding its alleged political motivation, falls within the scope of RSA 642:1.

*Affirmed.*

BRODERICK, DALIANIS and DUGGAN, JJ., concurred.